Case No. 25-1863, Estate of George Worrell Jr v. Thang Inc, et al. Argument is not to exceed 15 minutes per side. Mr. Bush for the appellant. Good morning, Your Honors. I'd like to reserve three minutes for rebuttal, please. Fine. Your Honors, may it please the Court. My name is Richard Bush, and I represent the estate of Bernie Worrell, who, even according to Mr. George Clinton, was a musical genius, who was a founding member of the legendary group Parliament Funkadelic, the musical director of Parliament Funkadelic, and who was instrumental, the architect, in creating the sounds of that iconic music. There really is no debate on this. Indeed, Mr. Clinton's own expert agreed that Mr. Worrell was essential in shaping the sound and energy of Parliament Funkadelic. While there are other issues raised by the parties, which I can address if there are questions about them, the District Court granted Appellee's Motion for Summary Judgment on the narrow issue of the statute of limitations, and specifically the issue of repudiation, finding that certain actions prior to Clinton's 2020 affidavit in a New York action where he repudiated the party's 1976 agreement for the first time also supposedly constituted repudiation, which the court found thus bars the estate's claims, so that will be the focus of my argument in the limited time that I have. In this regard, the unique facts of this case must be understood in order to understand why the District Court was respectfully wrong. First, Bernie Worrell believed he had entered into a recording agreement with the appellee's company, Fang Inc., in 1976. Why would he not? He signed it, and the agreement was sent to him to sign by George Clinton and Fang Inc. And number two, he sued, Mr. Worrell sued Fang Inc. and Clinton in 1981 for failure of Clinton to pay him royalties owed under the 1976 agreement. When would you say there are facts that would suggest repudiation? Not until Mr. Clinton's affidavit in 2020, and I'll explain why, Your Honor. In 1981, this is very important. In 1981, Mr. Worrell sued Clinton and Fang Inc. for failure to pay him royalties under the 1976 agreement and his separate publishing agreement after the nonpayment was revealed in an audit. In that litigation, this is important, the 1976 agreement was specifically referenced in the verified complaint. That's at record 134-5, page ID 4137-46. The 1976 agreement was referenced in that 1981 complaint Mr. Worrell filed. Was there an answer that addressed that? They did not move to dismiss. They did not move to claim that there was no agreement. The contrary happened. Clinton did not deny the existence of the 76 agreement, but settled that litigation for $150,000 for past royalties owed and then listed that amount, the $150,000, in his 1984 bankruptcy as owed to Worrell for royalty commissions. There was also 1984 litigation initiated by Worrell to enforce the settlement agreement. That's at record 134-6, page ID 4148. That's a 1984 complaint. Mr. Clinton's record deals with Casablanca and Warner Brothers specifically represent and warrant that Clinton had written agreements with the performers, including Worrell, assigning the rights to him. The Casablanca agreement makes specific reference to a written quote-unquote Worrell agreement. Therefore, at no point at any time in Bernie Worrell's life or thereafter prior to 2020 did George Clinton do anything that was hostile to the existence of the 76 agreement. The standard for that is set forth in Everly and Roger Miller and Brownstein, which the parties cite in their briefs. Even if we agreed with you, wouldn't that just pertain to the possible three years of the 76 agreement in the sense that the 76 agreement was for one year and it had the possibility of extensions for two one-year periods? Wouldn't there be a genuine issue of material fact on the statute of limitations just with respect to those three years? Your Honor, that goes to the issue about whether the contract was prospective only or not. The district court made a mistake in conflating two things. The recording obligations were prospective. That means Bernie was to record for a period of time, but the rights that were under the 76 agreement were not just prospective. In fact, Your Honor, if you give me one second, please. I thought that the 76 contract was just for one year with the opportunity for two one-year extensions. Right. Again, that goes to his recording obligations that he would record for that time, but under the agreement there were rights that were granted, albums that were granted, rights to exploit by Thang Inc., and that was not just prospective. That was also things that had been recorded before. So the 1976 agreement was actually the culmination of two prior oral agreements that had been entered into, and we've addressed this in our briefs. One for public performances, and two was for him to become a part of Thang Inc., meaning Mr. Worrell, and so therefore the rights that were granted to Thang Inc. under the 76 agreement were not just for prospective recording obligations, but rights that were granted for Thang Inc. to own recordings, including prior recordings. That answers Your Honor's questions, and if we look at the language of the agreement, it makes that very clear, and I can run through that if Your Honor is interested in that. Well, we can go back to the agreement to study it, but is your theory then that, well, to ask a question, did Worrell do things to benefit Thang and Clinton subsequently, and how long did that continue? It continued for the length of the time that they were recording. Bernie Worrell recorded everything that Parliament Funkadelic did. He was an essential member of the band throughout the entire length of its existence. Throughout the entire life of the band?  But he was given no credit at any time, forward at least, in say set 80, 85, and that sort of time. No, that's not correct. Also, that's a misunderstanding as well. Bernie Worrell was obviously, so what we're talking about is the P line in the album. That's the copyright owner. Because Mr. Worrell was not the copyright owner, he had signed his rights in the 76th Agreement to Thang Inc., the record label, the copyright owner would be Thang Inc., or it would be the record label releasing the album. But if you look at the liner notes in the albums, Mr. Worrell is credited throughout there as performing on the albums. So that's like saying that for the White Album, because the Beatles are being credited, Paul McCartney is not being credited. Of course he is. He's credited as writer, performer, all those different things, and that's how Mr. Worrell is credited as well. You're pointing to the liner notes as opposed to any other thing. Well, it's not opposed to any other thing. The only place where he would not be credited would be on what's called the copyright owner line, which is the P line. And of course he's not, because that's actually consistent with the 76th Agreement, because he had assigned his rights, so therefore why would he be identified as the copyright owner? But to go back one second, if I could, as I said, 76th Agreement was referenced in the verified complaint. Also, there was a resolution of the audit claims, and then, and this is important also, Mr. Clinton submitted in his papers a declaration where he references a supposed conversation that he had with Bernie Worrell right before Mr. Worrell was dying in the 2000s. And in that conversation, while Mr. Worrell was dying, he has a conversation with Mr. Clinton that Mr. Clinton relays in his declaration. Of course we don't know about it because it's one-sided, that's what Mr. Clinton says, but importantly, in that conversation, Mr. Worrell basically says, I'm dying, I'd like if you would pay me royalties. And Mr. Clinton responds by saying, not that there's no contract or disavowing the contract, he says, I'm not getting paid from the record labels, so I have no money to pay you. He then says, and I'm not willing to give you back any rights, that's what he adds in a separate line, but when Mr. Worrell says to him, pay me royalties, what Mr. Clinton says is, I'm not being paid, so I don't have money to pay you. Not there's no contract, not I don't owe you royalties, not anything like that. Until the affidavit in 2020 that Mr. Clinton signed to try to avoid a lawsuit by the estate for non-payment of royalties in the 1976 agreement, there was absolutely no repudiation whatsoever of the 1976 agreement. To the contrary, all of the facts in the 1980s show confirmation of the agreement, because when he got sued, he didn't say there's no agreement, he settled. He listed Worrell for royalty commissions in his bankruptcy, and there's no evidence in this record. And you might ask, well, why didn't Mr. Worrell do anything from the mid-80s until 2020? Because he tried. He tried to sue, he sued, he settled, he never got paid, and Mr. Clinton has always pled poverty. I don't have money, the record labels aren't paying me. In fact, Mr. Clinton confirms that when he submits that declaration to this very court. Are the royalties limited to the $150,000, or are you contending there's more? Well, the $150,000 was up through 1983 or 1982 at the time that Mr. Worrell filed the initial lawsuit. Of course, there would be royalties that were owed thereafter, but as Mr. Clinton points out in his own declaration, when Mr. Worrell asked for them, he said, I don't have money to give you. And that would be at a minimum based on the 76 to 79 period, even if we don't agree with you about things recorded after 79. Yeah, it would be everything that was owed, and the albums continue to be sold, there should be royalties that would be owed thereafter on albums that were sold, whether prior to 76 or after 76. Are many of these things fact questions, because the issue that the district judge ruled on was the statute of limitations. Correct. And the district judge ruled based on summary judgment on that. So if we were to think there were fact questions, we would send the case back. Correct, Your Honor. Both for determination after full development of the evidence on the statute of limitations, but also on all sorts of other questions. Yeah, and I obviously don't have time to address the other issues such as perspective versus retroactive and other things that have been raised, but they're all in our papers. And yes, if Your Honors believe, and that was my kind of fallback, was going to be at minimum there are factual issues in this case. I would like to say summary judgment should be entered for us, but at minimum there are factual issues that require factual development of the record that we believe would require at minimum a return to the district court. Thank you. Thank you very much. Good morning. Eric Scharf on behalf of George Clinton and Thang Incorporated. The year was 1969. Lyndon Johnson just handed off the presidency to Richard Nixon for his first term. Man was learning to walk on the moon. If my parents are to be believed, I was learning to walk on the earth. Mr. Worrell joined Parliament and Funkadelic. He was a talented musician, there's no question about that. For approximately 12 years, Mr. Worrell performed with Parliament and Funkadelic. So was that the whole length of Parliament and Funkadelic's performance? No, Your Honor. Worrell stopped at some point being involved? That's correct, Your Honor, but it was not the entire life of Parliament and Funkadelic. In fact, Parliament existed before Mr. Worrell and after Mr. Worrell. In fact, if you look at the timeline, the critical years start in the early 80s. In 1980, there's an audit. In 1981, there's a lawsuit. In 1982, there's a settlement. That settlement is critical. The settlement results in a release in exchange for a payment of $150,000. That release is a complete quit. We're quits, we're walking away, we're going to pay $150,000, and that covered not just the royalties that are issued here, which are sound recording royalties, not writing royalties. That settlement covered everything. But that money was never paid, even the original $20,000, right? Your Honor, the record isn't clear as to what money did actually change hands. I think the district court's under the impression that it wasn't paid. Regardless, it's not material to the outcome, because what then did happen subsequently in 1984, there is a follow-on lawsuit for payment of some amount of it. Whatever else is clear, the full amount of it wasn't paid, that much is clear. As to what was paid, I'm not sure. And Mr. Clinton did declare bankruptcy in 1984 as well. So the 1984, you said there was a suit, and what became of that, I thought it kind of went away in the bankruptcy. It did. That's correct, Your Honor. What's critical, though, for purposes of the statute of limitations analysis is, after that, there is literally nothing. It becomes flatline. Everything dealing with Mr. Clinton and Mr. Worrell's economic dealings, be it under the 1976 unsigned piece of paper, be it under the oral agreements, be it under the American Federation of Musicians session contracts, be it under oral agreements, everything ceases. But isn't the key whether there was repudiation by Clinton slash Fang? And your opponent's theory is that there wasn't repudiation because these settlements suggested that they were agreeing that there was some kind of agreement, whether it's the 76 contract or not. And so what did Fang or Clinton do between the bankruptcy date and the date where Clinton says, oh, you don't have my signature on this agreement that I sent to you and you signed? Okay. Let's break that into two components, for one thing. Opponent's theory is that repudiation is key to what they call repudiation of the contract or agreement, which is a non-starter, non-sequitur for multiple different reasons. The 1976 piece of paper isn't a contract to begin with. It can't be repudiated in the sense of the legal term or the legal meaning of repudiation, which is you actually have a recognized contract and someone says, I'm not going to perform under a recognized contract. Let's set that aside for a second. Just your comment makes me wonder, who drafted the 76 agreement? I don't know, Your Honor. The record isn't clear on that. Was it your side or was it Worrell who drafted it? I don't know, Your Honor, and the record doesn't bear on that. I believe the appellant asserts that we drafted it, but I'm not sure who drafted it, and I don't know that there's any— You sent it to Worrell. That is the appellant's assertion. That is correct, Your Honor, but there is no record evidence bearing on the origins of that document or its subsequent treatment. Judge Moore, you hit the nail on the head. It was a one-year—the way it's drafted, it would amount to one year with the ability to renew, and the renewals had to be executed as well. There's no evidence of it ever been—if it even had been executed in 76, that it had been renewed for any subsequent periods of time. But we're stacking up questions, and I want to get back— I understand you had a question about repudiation. Let's deal with it in two steps. First, the alternate legal universe in which the appellant is living, in which the repudiation is an attack on the 76 agreement, where the repudiation occurs in 2020. Well, but isn't the legal concept repudiation of ownership rights? And it doesn't—do you disagree with Everly saying it is supposed to be a plain and express repudiation? We certainly don't disagree with Everly. Okay, so the question I'd put to you, and I'm looking at the district court's opinion when you say, okay, if there was repudiation prior to 2020, when did it happen? And the district court says he occurred before 2020, perhaps when he learned he wasn't receiving royalties no later than the late 1980s. But that makes it sound like the Cheshire Cat—it faded away. There was no bright line. There was no plain and express repudiation. So what do you say was the plain and express repudiation? Let me speak to that exactly. What the district court said, and what the district court is key to is, where I ended what I was talking about, the complete cessation of economic activity post-1984. What the district court did, in the way all good district courts do when they're busy, is they cut through—basically they sliced the Gordian knot here and said, you know what, this contractual or this legal theory you've got about repeating the contract and everything, okay, maybe legally that's valid. Regardless, nothing happened after 1984. At minimum, you were on notice that you had to complain about something when after 1984, you're not getting royalties, the contract is not being honored, nothing's happening. So for 36 years— Does that sound like, you might say, garden variety statute of limitations inquiry notice, as opposed to this kind of express repudiation requirement in the music context from the Everly case? And, Your Honor, that's what I was coming to next, is let's look at the two halves of this. The legal universe in which the appellant wants to live, in which everything is keyed to attacking the 2020 agreement, and it's got to be repudiating the contract, something that attacks the contract. At minimum, the district court says, that's done in 1984, starting the statute running three years later, late, late 80s, maybe 87, 88, because nobody is paying under the contract. But wasn't Clinton bankrupt? So wouldn't, you know, the theory, I don't know when the bankruptcy was finally adjudicated, but he didn't have money. And that's his defense, apparently, in the bankruptcy. I don't have any money, so the claim against me should be gone. In theory, but the royalties coming in would be a stream of income coming in post-bankruptcy as well. And that would have come in at some point and be refreshed when Clinton would have emerged, Clinton and or Thang would have emerged from bankruptcy. If the contract emerged, do we know? You know, the record isn't clear on that. I'm sorry, I don't know. Based on my basic knowledge of bankruptcy, I would say a few years after 84. And do we know what the bankruptcy court decided vis-a-vis the claim of the $150,000 that Worrell had against Clinton? Your Honor, I don't know off the top of my head, and the record isn't clear on that. The listing of claims ran to more than $10 million, so Worrell was kind of a little pimple on his financial problems. That's possible. I've got so many questions stacked up here. I know, I'm trying to get back to, again, there's two halves of things. The district court's simple solution. Look, if you want to key it to the contract or the 76 agreement, nothing's being done to honor that post-84. You've got 36 years of dishonor of that. So if that's what the storm clouds or the warning is or what should tip you off, you had a 36-year run of that. But let's go back to what both Judge Moore and Judge Boggs, what you're both getting at is, what about Everly Brothers and what about its different criteria for repudiation, if I understand your question correctly? And we've got that in spades, so I want to quickly hit on that. I think we've got four different levels of Everly Brothers repudiation going on, simultaneously with the refusal to pay royalties under if the 76 agreement, and I'm putting air quotes around it at this point because we don't agree it's an agreement, but if it were, it's not being honored economically. So you've got four other levels of this. First is the issue of the P line, which is payment or rather accreditation. And counsel for Mr. Worrell said, well, there's liner notes in which Mr. Worrell is credited. That is completely incorrect as a matter of law. Yes, he is on the liner notes for things like writing. The P line is... It wouldn't be repudiation if, in fact, he had signed over all of those copyright ownership rights. So he wouldn't have been on the P line. At that point, Your Honor, the idea would be effectively you've self-repudiated. You said, you're right, I don't own this stuff. But the bottom line is if he's given them up, whether voluntarily or by mistake, he is on notice that he does not have sound recording interests. So let's deal just first with a simple factual question. But was that what the 76 agreement was doing? No. It was not giving away ownership rights? It was saying that he's never going to have ownership rights because, as I read it, it would basically just be a way of being compensated in lieu of being a co-author. It would have been a work-for-hire situation. Basically what it's saying is I'm going to get paid a certain amount. Some of it's going to be denominated in terms of royalties. Some of it's going to be cash. The way he'd been being paid all along, getting bits and pieces of things to work with Parliament. But if there was this agreement, wouldn't it be totally proper for him not to be listed on the P line? If there were an agreement, would it be proper? Sorry? Sorry. Yes, Your Honor. The short answer is yes. In fact, it has always been proper for him not to be listed on the P line because he was never a co-author under any scenario. So it's always been proper. That is correct. And if Mr. Worrell had a problem with that and thought he should have been listed, thought he should have been a co-author, the fact that he was not listed as a co-author and he was an artist there when the recordings were done, came out and saw someone else taking the credit, he had three years to complain about it at that point. That's what Everly Brothers says, building upon the First Circuit's case called Santa Rosa, which is the case which stands most prominently for the proposition of artist at inception accrual. If you're an artist and you're there and you watch somebody record something, put their name on it on the P line, and you wait three years, at that point you're barred. That is a form of accrual. So the first, again, I'm going to run through quickly four of these basic copyright things, not on the P line. The second one, B, is nonpayment. At no point does Mr. Worrell receive payment of the royalties. And, again, this is one of the factors listed in Everly Brothers as something that puts somebody that accrues a claim against, that starts the process of accrual. C is the 2016 confrontation. And counsel for Worrell mischaracterizes, to say the least, the declaration, saying that that declaration has Mr. Clinton saying, I'm too poor to pay you. It does not. Point blank. If you read that declaration, it does not say that. In fact, I excerpted it because it's so important. What he says is, I'm going to read this directly into the record. Mr. Clinton says, I could not and would not relinquish to him, Mr. Worrell, or anyone else the rights in the sum recordings at issue here, or recognize his rights and told him so. The rest of the declaration goes on to say it happened in the context of a call made to Mr. Worrell and his wife offering to assist him in reestablishing his publishing copyrights, which are different from the sum recording copyrights, but at the same time saying, yes, I want to help you with those because those are yours, but not the sum recording. And what it does say is that I don't own quite a bit of the sum recording rights, which is true, apparently. The record companies own the vast bulk of them, and he only owns sum recording, Mr. Clinton only owns sum recording rights for four of them. But. Your red light is on. If you want to say, I know you had a fourth item, if you want to tell us what that was. The fourth was the Worrell's public acknowledgement on their websites that they were not being paid the royalties. I briefly point out that we have alternate basis to affirm, in particular, the elements of co-authorship, and they were not established, nor could they be established. We'd ask that you affirm, and thank you for your assistance. Thank you. I know I only have three minutes, so I'm going to go as quickly as I possibly can. First of all, I'll start where opposing counsel just ended up. It's really interesting. The paragraph that he read where he quoted from Mr. Clinton's declaration or affidavit, he says, I'm not willing to give up rights. Well, the rights he got were from the 76 agreement, and he did not specifically read, for your honors, the prior paragraph, which is what I relayed, where Mr. Worrell said, pay me my royalties, and Mr. Clinton responded by saying, I'm not getting paid. That's why you're not being paid. He didn't read that paragraph, and the paragraph he read doesn't even help him. Secondly, I did make one error. When I was up here, Mr. Worrell went to his own group in 1984, Talking Heads, but he was there from 1969, and the heyday of Parliament Funkadelic was 1969 to basically 1980, the main time that they were a big group and making hits and those kind of things, so I want to correct that. Also, look at the actual 1976 agreement. It is obvious that Thang, Inc. drafted that agreement and sent it to Mr. Worrell. The introductory paragraph says that it was entered into by Thang, Inc., care of Weiss and Maubach, a law firm, and it's to Mr. Worrell. It's obvious that this was drafted by Mr. Clinton's company and sent to Mr.  It couldn't be more obvious from the face of it. It is also obvious, it is also a fact, that the mere nonpayment of royalties is not express repudiation. That's under the Roger Miller case. Furthermore, the fact is that if you focus on the key time frame here, the early to mid-1980s, Mr. Clinton was not repudiating the 1976 agreement. He was acknowledging it by entering into settlement agreements. The only thing that Mr. Worrell not pursuing it thereafter would mean would be that basically there was a breach of contract by not paying, and Mr. Worrell, there's a rolling, as your honors know, there's a rolling statute of limitations, which means that for the sales that were occurring, depending on the jurisdiction, if it was New York, I believe it's six years or four years, there would be a breach of contract for three years under the Copyright Act. That's how long you can go back for royalties for breach of contract, but that's all it is. Not pursuing something when you've pursued it before and weren't paid is not express repudiation. It's just, and especially when here, Mr. Clinton acknowledged the agreement through the mid-1980s. So I don't even understand the argument that was being made by opposing counsel. Also, I want to mention the release. The release that was entered into between the parties could not, as a matter of law, release future actions. So the fact that they released the claims that Mr. Worrell had as of the date of the settlement agreement does not speak to Mr. Worrell releasing, he could not, as a matter of law, release things that happen in the future, such as this repudiation that occurred in 2020 for the first time. That's when his copyright claim for ownership accrued. He couldn't release that before Mr. Clinton was repudiated. It makes no sense. And your red light is on. Thank you very much. Thank you both for your argument.